**RELIANCE INSURANCE COMPANY, Plaintiff,**

v.

**CHEVRON U.S.A. INC., Northern Gas Products Company, Defendants.**

**NORTHERN GAS PRODUCTS COMPANY, a Delaware corporation, Third-Party Plaintiff,**

v.

**SEARLE BROS. CONSTRUCTION CO., a Wyoming corporation, Third-Party Defendant.**

**No. 85–130.**

Supreme Court of Wyoming.

Jan. 30, 1986.

Harold E. Meier of Schwartz, Bon, McCrary & Walker, Casper, for plaintiff.

Michael J. Sullivan of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for defendant Chevron U.S.A., Inc.

Before THOMAS, C.J., and ROONEY,[*] BROWN, CARDINE and URBIGKIT, JJ.

CARDINE, Justice.

We are here presented with the following certified question from the United States District Court for the District of Wyoming:

"Do the provisions of §§ 30–1–131 and 30–1–132, Wyoming Compiled Statutes, 1977, include the activities of the contractor as described in the stipulated fact situation so as to render void a contract provision indemnifying a party even though such party may have itself been negligent?"

We hold that the agreement between the contractor and Chevron, as reflected by the activities described in the stipulated fact situation, was an agreement to which §§ 30–1–131 and 30–1–132, W.S.1977 (June 1983 Replacement) do not apply. Therefore, §§ 30–1–131 and 30–1–132, taken together, do not void the indemnity provision at issue.

## FACTS

On December 19, 1977, Searle Brothers Construction Company entered into a construction contract with Chevron USA Inc. The contract did not specify the kind of work Searle would be performing for Chevron. Under the heading "Description of Work and Materials to be Furnished," the contract merely stated that Searle would "[f]urnish labor, materials and equipment as needed to perform work as instructed by Chevron representatives."

The contract also contained an indemnity clause which stated:

"Contractor agrees, irrespective of negligence on the part of either Company or Contractor, to protect, defend, indemnify and hold Company, its agents and em-

[*] Retired November 30, 1985.

ployees, harmless from and against all loss, damage, liability, claims and liens of every kind arising out of or attributable, directly or indirectly, to the operations of Contractor hereunder, including without limitation, all claims for injury to or death of persons, loss of or damage to property * * *."

On August 28, 1982, a fire broke out at Chevron's oil and gas separation facility in the Painter Oil and Gas Field near Evanston, Wyoming. Because of the fire, large quantities of oil and water threatened to flow from the plant into local drainages. The Chevron plant manager contacted Searle and asked that it furnish two caterpillars to dig holding pits to contain the waste water and oil. Searle furnished two caterpillars as requested. In the process of digging the pits, one of the caterpillars struck a high pressure propane line owned by Northern Gas Products. A fire ensued which destroyed the caterpillar and caused Searle's operator serious burn injuries.

Reliance Insurance Company, Searle's insurer, paid the claims for damage and personal injury caused by the fire and thereby became subrogated to Searle's position. As Searle's subrogee, Reliance then filed suit against Chevron and Northern in the United States District Court to recover the monies it had paid. Chevron moved for summary judgment claiming that the indemnity clause in its contract with Searle would bar Searle from recovery even if Chevron was negligent and, therefore, Searle's subrogee, Reliance, was also barred by the clause. Reliance responded that the indemnity clause upon which Chevron relied was rendered void and unenforceable by § 30-1-131, W.S.1977 (June 1983 Replacement). The district court found against Reliance, holding that the indemnity provision in the contract was valid and enforceable. Reliance attempted an interlocutory appeal to the Tenth Circuit which refused to decide whether or not the indemnity clause was void and unenforceable pursuant to §§ 30-1-131 and 30-1-132, W.S.1977 (June 1983 Replacement). After remand, the district court certified the question to this court.

## THE ANTI-INDEMNITY STATUTE

Section 30-1-131, W.S.1977, provides as follows:

"(a) All agreements, covenants or promises contained in, collateral to or affecting any agreement pertaining to any well for oil, gas or water, or mine for any mineral, which purport to indemnify the indemnitee against loss or liability for damages for:

"(i) Death or bodily injury to persons;

"(ii) Injury to property; or

"(iii) Any other loss, damage, or expense arising under either (i) or (ii) from:

"(A) The sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee or any independent contractor who is directly responsible to such indemnitee; or

"(B) From any accident which occurs in operations carried on at the direction or under the supervision of the indemnitee or an employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee, *are against public policy and are void and unenforceable to the extent that such contract of indemnity by its terms purports to relieve the indemnitee from loss or liability for his own negligence.* This provision shall not affect the validity of any insurance contract or any benefit conferred by the Worker's Compensation Law [§§ 27-12-101 to 27-12-805] of this state." (Emphasis added.)

In their briefs and at oral argument, the parties have conceded that the indemnity clause in the Searle-Chevron contract is void and unenforceable if § 30-1-131, W.S. 1977, supra, applies to the contract. But, § 30-1-131 voids only those indemnity clauses which are part of "any agreement pertaining to any well for oil, gas or water, or mine for any mineral." Reliance contends that the Searle-Chevron agreement

pertains to a well for oil or gas while Chevron counters that it does not.[1] In order to discover which party is right, we must ascertain the scope of the agreement itself and then compare that agreement with § 30–1–132, W.S.1977, supra, which specifies when an agreement pertains to an oil or gas well.

## THE SEARLE–CHEVRON AGREEMENT

■ As we indicated in the statement of facts, the Searle-Chevron agreement does not, by itself, involve any particular services. It merely provides that Searle will "[f]urnish labor, materials and equipment as needed to perform work as instructed by Chevron representatives." We would not decide this certified question if only the written agreement were before us because extrinsic evidence would then be necessary to flesh out the contract. Our role in certified question cases does not include fact finding. Section 1–13–106, W.S.1977.

Fortunately, the district court and the parties agree upon the facts in certifying this question to us. In its certification order the district court stated: "The parties are in essential agreement as to the facts as they relate to the activities of Searle Bros. and work being done under the contract." The parties have indicated, in their briefs and at oral argument, that the *Searle-Chevron contract is to be interpreted to have a scope coextensive with the activities of Searle at the August 28th fire.* In other words, we view this contract as one covering only Searle's fire-related activities near Chevron's Painter Field Separation Plant at the time of the accident.

## SECTION 30–1–132

Having set forth the scope of the Searle-Chevron agreement, we must next decide whether that agreement is one "pertaining to any well for oil, gas, or water" as that phrase is defined in § 30–1–132, W.S.1977, supra.

*"The term 'agreement pertaining to any well for oil, gas, or water, or mine for any mineral' as used in section 1 hereof [§ 30–1–131], means any agreement or understanding, written or oral, concerning any operations related to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or disposing of oil, gas or other minerals, or water, and designing, excavating, constructing, improving, or otherwise rendering services in or in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation."* (Emphasis added.) Section 30–1–132, W.S.1977 (June 1983 Replacement.)

■ Section 30–1–132, W.S.1977, supra, separately defines an agreement pertaining to a "well for oil, gas, or water" and an agreement pertaining to a "mine for any mineral." The first part, which we have emphasized, applies when oil, gas or water wells are involved. The second part, which follows the word "and," applies to agreements which concern mining, rather than drilling. Our interpretation of § 30–1–132 as a two-part statute is supported by the language contained in the two parts. Drilling, deepening, reworking, acidizing, and many of the other terms in the first part clearly apply to oil or gas well-drilling operations. On the other hand, mine shaft and drift are terms which relate to mining, and they are found in the second part of the statute. Were we not to differentiate between the two parts of § 30–1–132, some of the language would be superflous. For example, there would be no need to discuss

1. Neither party claims that the agreement pertains to a mine for mineral.

the "rendering [of] services * * * in connection with any well drilled for the purpose of producing * * * oil" in the first part of the statute, if oil and gas activity were also covered by the phrase "rendering services * * * in connection with any * * * other structure intended for use in the exploration for or production of any mineral," which appears later in the statute. A statute should not be interpreted to render any portion of it meaningless. *Thomson v. Wyoming In-Stream Flow Committee*, Wyo., 651 P.2d 778, 787 (1982).

Much of Reliance's statutory argument is based upon inapplicable language from the second part of § 30–1–132. For instance, Reliance claims that Chevron's plant processed natural gas which was used to repressurize wells in the Painter Oil and Gas Field. Therefore, according to Reliance, when Searle dug pits to capture runoff from the fire at Chevron's plant, Searle was "rendering services * * * in connection with * * * [a] structure intended for use in the * * * production of any mineral." But, as we have said, this section of the statute defines an agreement pertaining to mining, not an agreement pertaining to a well for oil, gas or water. Wven if we agreed with Reliance that this pit digging was a service in connection with Chevron's separation plant, we could not take the next step in Reliance's logic and say that the plant was a "mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral." The part of § 30–1–131 relied upon by Reliance does not include oil or gas production facilities but is instead limited to structures used in mining.

The relevant first portion of § 30–1–132 contains a list of activities to which an agreement must "relate" before that agreement can be said to pertain to a well for oil or gas. At the end of the list, the statute includes a catchall phrase which indicates that some unlisted contractual activities could also be included. Reliance does not attempt to link Searle's pit digging activities to any of the specifically listed activities. Instead, Reliance argues that by digging the pits Searle was "other-

wise rendering services in or in connection with any well drilled for the purpose of producing or disposing of oil, gas or other minerals, or water."

We disagree. We do not think that one who digs pits to collect waste fluids from a fire at a separation plant is rendering services in connection with an oil well. This is true even if the separation plant processes gas which is eventually reinjected into the oil field to repressurize oil wells. Searle was digging the pits so that waste from the fire would not flow into local drainages. It was not involved in actual fire fighting which would enable the plant to resume repressurization.

The catchall phrase, "rendering services * * * in connection with any well," follows a list of specific activities which are closely related to well drilling. Under the rule of statutory construction, ejusdem generis, a general term which concludes a list of specifically enumerated terms should be restricted to the same genus as the things enumerated. *Green River Development Company v. FMC Corporation*, Wyo., 660 P.2d 339, 353 (1983). Therefore, the phrase, "rendering services * * * in connection with any well," should be construed to cover only those services closely related to well drilling. Not covered are services or activities having a remote or indirect connection to the kinds of services enumerated in § 30–1–132, supra.

Finally, we note that the statutory scheme created by §§ 30–1–131 and 30–1–132 restricts the freedom to contract, a common law right. Statutes which preempt common law rights must be strictly construed. *Mahaney v. Hunter Enterprises, Inc.*, Wyo., 426 P.2d 442, 444 (1967).

## CONCLUSION

In conclusion, we think that the district court's initial interpretation of §§ 30–1–131 and 30–1–132 upon the parties' cross-motions for summary judgment was correct. The Searle-Chevron contract, as clarified by the parties' activities, was not an agree-

ment "pertaining to [a] well for oil [or] gas" as that phrase is defined by § 30–1–132, W.S.1977, supra. Therefore, § 30–1–131 does not apply to void the indemnification provision upon which Chevron relies.

The answer to the certified question is "no."