2004 WY 36

**UNION PACIFIC RESOURCES COMPANY, Appellant (Cross–Claim Plaintiff),**

v.

**William DOLENC, d/b/a Dolenc Welding Service, Appellee (Cross–Claim Defendant.).**

**No. 03–75.**

Supreme Court of Wyoming.

April 2, 2004.

Representing Appellant: Richard H. Honaker of Honaker Law Offices, LC, Rock Springs, Wyoming.

Representing Appellee: J. Kent Rutledge and Kevin C. Cook of Lathrop & Rutledge, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Union Pacific Resources Company (UPRC) sought indemnification from Dolenc Welding Service (Dolenc) when an injured employee of a subcontractor working on a

UPRC water line sued to recover for his injuries. The district court granted summary judgment in favor of Dolenc holding the indemnification provision of the contract between UPRC and Dolenc was void and unenforceable pursuant to Wyo. Stat. Ann. § 30–1–131 (LexisNexis 2003). We reverse and hold that the anti-indemnity statute did not cover a contract involving work on a water plant used for purposes of secondary recovery in an oil field because it was not an agreement pertaining to an oil or gas well within the meaning of the statute.

## ISSUES

[¶ 2]   UPRC states the issue as:

Is the modification of water piping in a water plant directly related to an oil, gas or water well itself, such that Wyoming's anti-indemnity statute applies to void an agreement indemnifying an indemnitee against its own negligence?

[¶ 3]   The issues as stated by Dolenc are: [1]

1.   Does the agreement for services pertain to any well for oil, gas, or water, as described in W.S. § 30–1–131?

2.   Is the provision in the contract between the parties void and unenforceable because it is otherwise against public policy?

## STANDARD OF REVIEW

[¶ 4]   Summary judgment is appropriate when there is no genuine issue of material fact and the prevailing party is entitled to judgment as a matter of law. Wyoming Rules of Civil Procedure, 56(c). A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Baker v. Pena*, 2001 WY 122, 36 P.3d 602 (Wyo.2001). This case involves cross-motions for summary judgment in which neither party disputes the relevant facts. Therefore, this Court must only determine whether summary judgment was proper as a matter of law. *Cities Service Oil and Gas Corp. v. State*, 838 P.2d 146 (Wyo. 1992). We review matters of law *de novo* without affording any deference to the decision of the district court. *Wadi Petroleum, Inc. v. Ultra Resources, Inc.*, 2003 WY 41, 65 P.3d 703 (Wyo.2003).

## FACTS

[¶ 5]   UPRC operates an oil field near Patrick Draw in southwest Wyoming. As is typical in many oil fields, water known as "raw water" is produced with the oil. One way of handling the raw water is to treat it and then re-inject it into the field as part of a water flood operation, which improves and enhances the production of oil. During such an operation, the raw water is separated from the oil and transported from the field to a water plant through a system of pipes. The plant combines the raw water with fresh water produced from a water well, treats the water to remove excess sediment, and then stores it in a clear water tank. Pipes then carry the water to injection pumps where it is pumped under high pressure back to the oil field and down into the formation. The re-injection accomplishes two purposes—disposal of the raw water and enhancement of oil production by moving oil through the formation to a producing well bore where it can be brought to the surface. In a water flood operation, the operator takes steps to prevent bacteria, which can produce dangerous hydrogen sulfide gas, from forming in the water. This is accomplished by injecting chemicals into the raw water tanks, and keeping oxygen out of the tanks by piping natural gas into the water tanks to form a blanket on top of the water.

[¶ 6]   UPRC's operation included a water plant, however, it had not been functioning consistently due to leaking and dilapidated tanks and engines. Two of the engines had been out of service for over ten years because the clear water tank they were con-

---

1.   In its reply brief, UPRC raises the issue of whether Mr. Gomez was an "Employee," "Subcontractor", "Invitee" or "Licensee" of Dolenc. The district court found questions of material fact existed on this issue. In addition, the summary judgment in favor of Dolenc was limited to the application of §§ 30–1–131 and 132. Therefore, the issue of Mr. Gomez' status is not properly before us and we will not address it.

nected to had developed leaks and, therefore, UPRC had the pipelines leading to and from the tank blocked off with valves. The other three engines were either out of service or in such a state of disrepair that they were frequently shut down. In an effort to improve operation of the plant, UPRC decided to modify the piping so that engines one and two could be connected to the functional tank, thus relieving the other three dilapidated engines.

[¶ 7] Dolenc contracted with UPRC through a Master Service Contract to perform welding services as necessary. The terms of the contract provided Dolenc would indemnify UPRC for any "loss, cost, damage or expense ... arising out of bodily injury ... to ... any subcontractor ... arising out of the performance of the work, WHETHER OR NOT RESULTING IN WHOLE OR IN PART FROM THE SOLE, CONCURRENT, OR COMPARATIVE NEGLIGENCE, OR STRICT LIABILITY OF THE UPRC GROUP." Another contractor, Elkhorn Construction, entered into a similar contract with UPRC to provide labor on an as-needed, day-to-day basis.

[¶ 8] Pursuant to the contract, UPRC directed Dolenc to make the piping changes required in the water plant. Before welders undertook work in which they could potentially come into contact with hydrocarbons or other explosive material, UPRC typically issued them a "hot work permit." None was issued for Dolenc's work on the water plant piping because UPRC did not consider the water plant "a hot work permit area in that it was a water facility." Ordinarily, when a welder like Mr. Dolenc performs work, he has an assistant called a firewatch, who is equipped with a fire extinguisher. One of the firewatch's job duties is to make sure sparks thrown from the welder's torch do not start a fire. On this job, Luis Gomez, an employee of Elkhorn Construction, served as Mr. Dolenc's firewatch. When Mr. Dolenc started to cut the first pipe with his welding torch, there was an explosion. Mr. Gomez was knocked unconscious and suffered lacerations, burns, and other injuries. He filed suit against Dolenc and UPRC alleging both were negligent in failing to discover the water lines contained hydrocarbons and claiming damages for the injuries he suffered in the explosion.

[¶ 9] UPRC filed a cross-claim against Dolenc seeking indemnification pursuant to the Master Service Contract in effect at the time of the explosion. Mr. Gomez entered into a stipulation with UPRC to dismiss it from the case leaving Dolenc as the only defendant. Dolenc then moved for summary judgment against UPRC claiming the anti-indemnification statute prevented UPRC from enforcing the indemnification provision of the contract. UPRC filed a cross-motion for summary judgment seeking a determination that the statute did not apply and the contract was enforceable. The district court granted summary judgment in favor of Dolenc and UPRC filed this appeal.

## DISCUSSION

[¶ 10] UPRC argues the anti-indemnity statute does not apply to the facts in this case because the work being performed was not "in connection with any well" drilled for purposes of producing oil, gas or water as required by the anti-indemnification statute, which it asserts must be strictly construed because it constricts the common law right of freedom to contract. UPRC relies upon *Reliance Insurance Co. v. Chevron U.S.A. Inc.*, 713 P.2d 766 (Wyo.1986) and *Gainsco Insurance Co. v. Amoco Production Co.*, 2002 WY 122, 53 P.3d 1051 (Wyo.2002), in which we held contracts for work related to oil and gas production, but not to the wells themselves, were not covered by the statute.

[¶ 11] In response, Dolenc contends the language of the statute, which includes work done "in connection with" oil and gas wells, is broad enough to cover work performed on the water plant because the ultimate purpose was enhancement of oil production. With regard to *Reliance* and *Gainsco*, Dolenc claims they are factually different from this case and are not controlling.

[¶ 12] The anti-indemnification statutes provide:

§ 30–1–131. Provisions for indemnity in certain contracts; invalidity

(a) All agreements, covenants or promises contained in, collateral to or affecting any agreement pertaining to any well for oil, gas or water, or mine for any mineral, which purport to indemnify the indemnitee against loss or liability for damages for:

(i) Death or bodily injury to persons;

(ii) Injury to property; or

(iii) Any other loss, damage, or expense arising under either

(i) or (ii) from:

(A) The sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee or any independent contractor who is directly responsible to such indemnitee; or

(B) From any accident which occurs in operations carried on at the direction or under the supervision of the indemnitee or an employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee, are against public policy and are void and unenforceable to the extent that such contract of indemnity by its terms purports to relieve the indemnitee from loss or liability for his own negligence. This provision shall not affect the validity of any insurance contract or any benefit conferred by the Worker's Compensation Law [§§ 27–14–101 through 27–14–805] of this state.

§ 30–1–132. Provisions for indemnity in certain contracts; definition

The term "agreement pertaining to any well for oil, gas, or water, or mine for any mineral" as used in section 1 hereof [§ 30–1–131], means any agreement or understanding, written or oral, concerning any operations related to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or **otherwise rendering services in or in connection with any well drilled** for the purpose of producing or disposing of oil, gas or other minerals, or water, and designing, excavating, constructing, improving, or otherwise rendering services in or in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation. (emphasis added)

▮▮▮▮ [¶ 13] In interpreting these statutes, we apply well-known and accepted rules of statutory construction.

This court interprets statutes by giving effect to the legislature's intent. . . . We begin by making an inquiry relating to the ordinary and obvious meaning of the words employed according to their arrangement and connection. . . . We give effect to every word, clause, and sentence and construe together all components of a statute in *pari materia.* . . . Statutory interpretation is a question of law. . . . We review questions of law de novo without affording deference to the district court's decision." *Worcester v. State,* 2001 WY 82, ¶ 13, 30 P.3d 47, 52 (Wyo.2001). If a statute is clear and unambiguous, we simply give effect to its plain meaning. *Wesaw v. Quality Maintenance,* 2001 WY 17, ¶ 13, 19 P.3d 500, 506 (Wyo.2001) (quoting *In re Claim of Prasad,* 11 P.3d 344, 347 (Wyo. 2000)). Only when we find a statute to be ambiguous do we resort to the general principles of statutory construction. *Wesaw,* 2001 WY 17, ¶ 13, 19 P.3d at 506 (quoting *In re Claim of Prasad,* 11 P.3d at 347). An ambiguous statute is one whose meaning is uncertain because it is susceptible to more than one interpretation. *Pierson v. State,* 956 P.2d 1119, 1125 (Wyo. 1998) (quoting *Amrein v. State,* 836 P.2d 862, 864–65 (Wyo.1992)).

It is a basic rule of statutory construction that courts may try to determine legislative intent by considering the type of statute being interpreted and what the legislature intended by the language used, viewed in light of the objects and purposes to be accomplished. . . .

We are guided by the full text of the statute, paying attention to its internal structure and the functional relation between the parts and the whole. *In re*

*Worker's Compensation Claim of Johnson,* 2001 WY 48, ¶ 8, 23 P.3d 32, 35 (Wyo.2001) (quoting *In re Hernandez,* 8 P.3d 318, 321 (Wyo.2000) and *Parker Land and Cattle Co. v. Wyoming Game and Fish Com'n,* 845 P.2d 1040, 1045 (Wyo.1993)). Each word of a statute is to be afforded meaning, with none rendered superfluous. *Jessen v. Burry,* 13 P.3d 1118, 1120 (Wyo. 2000). Further, the meaning afforded to a word should be that word's standard popular meaning unless another meaning is clearly intended. *Soles v. State,* 809 P.2d 772, 773 (Wyo.1991). If the meaning of a word is unclear, it should be afforded the meaning that best accomplishes the statute's purpose. *Radalj v. Union Savings & Loan Ass'n,* 59 Wyo. 140, 138 P.2d 984, 996 (1943).

*Rodriquez v. Casey,* 2002 WY 111, ¶¶ 9–10, 50 P.3d 323, ¶¶ 9–10 (Wyo.2002).

[¶ 14]   Applying these rules, we conclude the anti-indemnity statute is awkward and contains an ambiguous description of the nature of the work or services to which it applies. Section 30–1–131(a) of the statute states that it applies to "any agreement pertaining to any well for oil, gas or water", suggesting the work or activity must be involved with the well itself. Section 30–1–132, however, defines the term "agreements pertaining to any well" as including any operations related to specific work, such as drilling, repairing, testing or plugging, "or otherwise rendering services in or in connection with any well drilled." Dolenc argues this catch-all phrase broadens the scope of the statute to include work beyond the well itself. Section 30–1–132 goes on to create even further ambiguity by including in the definition, "an agreement to perform any portion of any such work or services (referring back to the list and the catchall phrase) or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation." This last provision inserts the concept of any act "collateral" to work on the well, including the use of rental equipment and "incidental transportation" presumably of equipment and services to the well. The plain language of the statute fails to unam-

biguously answer the question presented by this case of how far beyond the well the anti-indemnity statute reaches. We, therefore, must resort to the rules of statutory construction to determine its meaning.

[¶ 15]   The legislative history of the statutes sheds little light on the question of legislative intent. The statute was adopted in 1969 and amended in 1977. (1969 Wyo. Sess. Laws, ch. 46, § 1; 1977 Wyo. Sess. Laws, ch. 145, § 1). However, the amendment is not relevant to the issue before us. The bill contained no statement of purpose. As we noted in *Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351, 1354 (Wyo.1978), the mineral industry in general involves ultrahazardous work, and by adoption of this statute the legislature was most likely addressing the safety issues raised by contracts which indemnify the indemnities from their own negligence which could have the effect of insulating persons responsible for such work from the consequences of unsafe practices in the workplace. However, we can only speculate as to why the legislature limited the statute to contracts for work performed on oil, gas and water *wells.* Absent legislative history, a statement of purpose or some other evidence of legislative intent, we are left to examine the statutory language to discern legislative intent.

[¶ 16]   This is not the first time this Court has considered the language of the anti-indemnity statutes in the context of determining the scope of the work and services intended to be covered. In *Reliance,* 713 P.2d 766, we determined work performed to construct holding ponds for collecting waste oil and water on the site of an oil and gas separator that had exploded and burned was not work "pertaining to" an oil and gas well and, therefore, the statute did not apply. The contract in that case was similar to the UPRC–Dolenc Master Service Contract in that it did not specify the type of work to be performed, only that the contractor would provide labor, materials and equipment "as needed." Chevron directed the contractor to dig holding ponds to prevent waste water and oil from entering adjacent drainages. In the performance of that work, the contractor struck a high-pressure propane line, which

caused a fire, damaged equipment, and caused personal injuries to the contractor's employee. *Id.* at 768, 769. We concluded the work was not covered by the statute, stating:

The relevant first portion of § 30–1–132 contains a list of activities to which an agreement must "relate" before that agreement can be said to pertain to a well for oil or gas. At the end of the list, the statute includes a catchall phrase which indicates that some unlisted contractual activities could also be included. Reliance does not attempt to link Searle's pit digging activities to any of the specifically listed activities. Instead, Reliance argues that by digging the pits Searle was "otherwise rendering services in or in connection with any well drilled for the purpose of producing or disposing of oil, gas or other minerals, or water."

We disagree. We do not think that one who digs pits to collect waste fluids from a fire at a separation plant is rendering services in connection with an oil well. *This is true even if the separation plant processes gas which is eventually reinjected into the oil field to repressurize oil wells.* Searle was digging the pits so that waste from the fire would not flow into local drainages. It was not involved in actual fire fighting which would enable the plant to resume repressurization.

The catchall phrase, "rendering services * * * * in connection with any well," follows a list of specific activities which are closely related to well drilling. Under the rule of statutory construction, ejusdem generis, a general term, which concludes a list of specifically enumerated terms, should be restricted to the same genus as the things enumerated. *Green River Development Company v. FMC Corporation, Wyo.,* 660 P.2d 339, 353 (1983). Therefore, the phrase, "rendering services * * * in connection with any well," should be construed to cover only those services closely related to well drilling. Not covered are services or activities having a remote or indirect connection to the kinds of services enumerated in § 30–1–132, supra

Finally, we note that the statutory scheme created by §§ 30–1–131 and 30–1–132 restricts the freedom to contract, a common law right. Statutes, which preempt common law rights, must be strictly construed. *Mahaney v. Hunter Enterprises, Inc., Wyo.,* 426 P.2d 442, 444 (1967).

*Id.* at 772 (emphasis added).

[¶ 17] Our reasoning in *Reliance* remains sound and compels us to reach the same conclusion in this case. When the catch-all phrase is considered in the context of the list of specific activities preceding it, all of which are activities conducted upon the well itself, the intent of the legislature is clear. The anti-indemnity statute applies only to contracts for work performed directly on oil, gas, and water wells. No valid distinction can be drawn between the facts in this case and those present in *Reliance.* That case involved work performed on a plant that separated gas from the produced oil and then returned the gas to the field to be reinjected for purposes of enhancing production. Dolenc performed the welding work in this case on piping in a water plant that separated water from produced oil and then returned the water to the field for reinjection for disposal of the water and enhancement of production. In either case, we cannot determine what distance the plants were located from the wells, but we can assume those plants were centrally located some distance away from the wells they served. The statutory construction rule of *ejusdem generis* instructs us that the legislature must have intended the catch-all phrase to include work similar to the activities specifically listed, all of which are performed on the well itself, not on processing equipment downstream of the well. In *Reliance,* we held work that was remote or indirectly related to work on the well itself was not covered by the language of the statute and we see no reason to deviate from that reasoning in this case.

[¶ 18] *Reliance* refers to the fact that the work did not involve actual fire fighting "which would enable the plant to resume repressurization." Dolenc further argues this language suggests that if the work somehow affects oil and gas well production, it is covered. Dolenc argues that because the work in this case improved and enhanced oil pro-

duction, it should be considered "in connection with" the oil well. We see two problems with Dolenc's argument. First, it ignores the specific types of well work listed by the legislature as being covered, none. of which relate to the processing of gas or water after production from the well has occurred. Second, the interpretation urged by Dolenc would extend coverage of the statute to any work, no matter how distant from the well or how indirectly related to the well. Under that theory, work anywhere in the course of oil and gas production, processing, transportation or distribution could be covered. We find no indication in the language of the statute that the legislature contemplated that result.

[¶ 19] We also addressed the reach of this statute in *Gainsco,* in which the work in question involved transporting oil skimmed from settling ponds to an oil storage tank. Again applying the rule of *ejusdem generis,* we held " 'or otherwise rendering services in or in connection with any well' was limited to those services similar to 'drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, [or] plugging' Wyo. Stat. Ann. § 30–1–132. Without doubt, those terms are directly related to the well itself, and not to general oil field work." *Id.* at ¶ 88. The similarities between the *Gainsco* facts and those before us in this case are also striking. The *Gainsco* contractor performed work on facilities that handled oil after it was produced from the well and separated from drilling fluids. Likewise, Dolenc was working on water lines that transported water after it had been separated from oil produced at the well.

[¶ 20] In both *Reliance* and *Gainsco,* we noted the statute restricts the common law right to contract and, therefore, must be strictly construed *Mahaney v. Hunter Enterprises, Inc.,* 426 P.2d 442, 444 (1967). Limiting the statute's application to only contracts for work performed on the wells follows that rule.

[¶ 21] Dolenc raises, and we recognize, the public policy concerns associated with contracts purporting to indemnify parties against their own negligence. In *Mountain Fuel Supply Co.,* 578 P.2d at 1354, we noted such contracts may remove or reduce the incentives to protect workers and others from personal injury and the anti-indemnity statute would help to insure that persons responsible for the work were properly motivated to provide safe working conditions. In finding the anti-indemnity statute constitutional, we concluded the legislature had a reasonable basis for singling out the mineral business as particularly hazardous and declaring unenforceable contracts involving that type of work which purported to relieve parties from liability for their own negligence.

It is generally known that the minerals industry is the single most dominant economic factor in the state. ([FN4]) There were projected to be 22,991 workers in the "Mining" sector in Wyoming in 1977, representing 11.5% of the total state work force. Mining employment figures were exceeded only by the services, trade and government sectors. ([FN5]) The growing significance of energy development in the state, and the parallel increase in the relative importance of mining employment are also noted. ([FN6]) It is also generally known that the drilling and completion of oil and gas wells is always a hazardous undertaking (*Pan American Petroleum Corporation v. Like,* Wyo., 381 P.2d 70, 74), and that it can be characterized as a particularly hazardous type of work.

*Id.* at 1355 (footnotes omitted). *See Davis v. Commonwealth Edison Co.,* 61 Ill.2d 494, 336 N.E.2d 881 (1975). For those reasons, we joined the many jurisdictions that require contracts purporting to indemnify parties against their own negligence to be strictly construed. *Wyoming Johnson, Inc. v. Stag Industries, Inc.,* 662 P.2d 96, 99 (Wyo.1983); *Northwinds of Wyoming, Inc. v. Phillips Petroleum Co.,* 779 P.2d 753 (Wyo.1989). However, we decline Dolenc's invitation to declare all contracts indemnifying parties against their own negligence void as against public policy. We do so for two reasons: first, Dolenc did not raise the issue in the district court, and second the legislature has established public policy in this arena and we will not second guess the wisdom of their

decisions in that regard. Whether the statute represents sound public policy is not our concern. As we noted in *Gainsco,* "We are not free to legislate. While the public policy of worker safety might be enhanced if the anti-indemnity statute applied to all work done in the oil field, or elsewhere, for that matter, the legislature has not chosen to take that step. We certainly cannot do so in its stead." [2] *Gainsco,* ¶ 88, n. 13. Also, we have consistently refrained from invalidating contracts between competent parties on the basis of public policy "unless the policy is well settled, unambiguous and not in conflict with another public policy equally or more compelling." *Goglio v. Star Valley Ranch Association,* 2002 WY 94, 48 P.3d 1072 (Wyo. 2002).

[¶ 22] Reversed and remanded.

---

2. If we had misinterpreted the legislature's intent in either *Reliance* (1986) or *Gainsco* (2002), we presume the legislature would have acted to correct our interpretation and it has not done so. We also note *Northwinds of Wyoming, Inc.,* 779 P.2d 753, dealt with a contract indemnifying the indemnitee against its own negligence and no suggestion was made that work on a natural gas pipeline would trigger the anti-indemnification statute.